IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:21-CV-117-FL

| | | |
|---|---|---|
| YACHT BASIN PROVISION COMPANY, d/b/a Provision Company, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| KATHY BATES, PHILLIP BATES, CYNDI MORAN, and PKC INVESTMENTS, LLC, d/b/a Inlet Provision Company, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure or, in the alternative, transfer pursuant to 28 U.S.C. § 1404(a) (DE 21). The issues raised have been briefed fully. For the following reasons, defendants' motion is granted in part and denied in part as set forth herein.

## STATEMENT OF THE CASE

Plaintiff, owner of a restaurant named Provision Company in Southport, North Carolina, commenced this action June 21, 2021, alleging infringement of its trademarks, in violation of 15 U.S.C. § 1114 and common law, unfair competition and cybersquatting, in violation of 15 U.S.C. § 1125, unfair and deceptive trade practices, in violation of N.C. Gen. Stat. § 75-1.1 et seq., and unjust enrichment in violation of North Carolina common law. In the operative second amended complaint, plaintiff asserts these claims against defendant PKC Investments, LLC, ("PKC Investments"), owner of a restaurant named Inlet Provision Company in Murrells Inlet, South

Carolina, and the limited liability company's members, defendants Kathy Bates, Phillip Bates, and Cyndi Moran ("Moran"), (collectively, the "individual defendants"). Plaintiff seeks compensatory and treble damages, injunctive relief, and attorneys' fees and costs.

In lieu of answer, defendants filed the instant motion to dismiss on the bases of Rules 12(b)(2) and 12(b)(3), asserting that this court lacks personal jurisdiction over them and that venue is improper. They move alternatively for transfer of this case to the United States District Court for the District of South Carolina, pursuant to 28 U.S.C. § 1404(a). Accordingly, the court stayed the parties' scheduling conference activities pending resolution of that motion. Plaintiff objected, contending that it required limited jurisdictional discovery to contest properly defendants' motion. The court granted plaintiff's request, allowing discovery limited to issues of the personal jurisdiction of this court over defendants.

After the close of that limited discovery, the parties completed briefing on the instant motion. In support of their motion, defendants rely on: 1) a screenshot of a portion of Inlet Provision Company's website; 2) affidavit of defendant Phillip Bates; and 3) deposition testimony of defendants Phillip Bates, Kathy Bates, and Moran. In opposition to that motion, plaintiff relies on the same deposition testimony and additionally: 1) email correspondence among defendant Moran, an individual named Bob Durand, and Tonya Carroll, an employee of Grand Strand Magazine; 2) a document detailing transactions by Inlet Provision Company; 3) the "media kit"[1] of Grand Strand Magazine; 4) a Grand Strand Magazine document listing "Where To Buy Grand Strand Magazine"; 5) The media kit of a magazine entitled Sasee; 6) email correspondence between and among defendant Moran and employees of the Strand Media Group, which is

---

[1] Defendant Moran affirmed at deposition that a media kit is "something that [a] magazine uses to promote itself to potential advertisers and to provide information to potential advertisers." (Moran Dep. (DE 38-3) at 102:21-103:2).

2

involved in publishing and/or marketing <u>Sasee</u> magazine; 7) screenshots of customer reviews of Inlet Provision Company on the websites "Yelp" and "Tripadvisor"; 8) a list of emails collected by the Inlet Provision Company website's mailing list function; 9) a screenshot of a coupon for Inlet Provision Company on a mobile application related to "Town Planner"; 10) an invoice for advertisements purchased by Inlet Provision Company from "WAVE 104.1"; 11) a screenshot of a webpage of "radiolineup.com"; 12) an annotated map of southeastern North Carolina; and 13) affidavit of Paul Swenson, owner of plaintiff.[2]

The court heard argument on the instant motion on May 19, 2022, and took the motion under advisement.

## STATEMENT OF THE FACTS

The court finds the following facts by the preponderance of the evidence.

A.     Background

Plaintiff is a North Carolina corporation that operates the Provision Company restaurant in Southport, North Carolina, which was established in the early 1990s. (Compl. (DE 46) ¶¶ 1, 17).[3] The restaurant, as described by plaintiff, has "the rustic look and feel of an old trading post or fishing and tackle store," with a sign, pictured as follows, stating that it offers "charters, provisions, supplies, and advice":

---

[2]     Plaintiff's index of exhibits in support of its response indicates that it intended to file certain "Sasee Communications" under seal. (DE 38-1). However, its now-unsealed filing includes no such documents and, instead, the filing denominated "Sasee Communications" is an index of the sealed exhibits filed by plaintiff. (DE 39-2).

[3]     Hereinafter, all references to the complaint in the text or "Compl." in citations are to the second amended complaint (DE 46).

3



(Id. ¶¶ 18, 25). Plaintiff owns U.S. Trademark Registration No. 2,364,222 for a "YACHT BASIN PROVISION CO." mark, (DE 46-4), and purports to own common law rights in a "PROVISION COMPANY" mark. (Compl. ¶ 19).

As pertinent to the instant motion, the foundation of plaintiff's claim is that defendants operate the Inlet Provision Company restaurant as essentially a copy of plaintiff's Provision Company restaurant. Defendants' restaurant is located in Murrells Inlet, South Carolina, and opened in 2019. (Phillip Bates Aff. (DE 22-2) ¶ 3, 10, 11-13; Moran Dep. (DE 37-3, 38-3) at 43:15-17, 137:10-15).[4] The sign for defendants' restaurant appears as follows:

---

[4] Where a deposition is cited, the court relies on the pagination of the deposition transcript rather than the page number supplied by the court's electronic case filing system (CM/ECF). In all other instances, page numbers in citations to documents and briefs in the record specify the page number imposed by CM/ECF rather than the page number showing on the face of the document, if any.



(Compl. ¶ 25).

Defendant PKC Investments is a South Carolina limited liability company with its principal place of business in Murrells Inlet, South Carolina. (Phillip Bates Aff. (DE 22-2) ¶ 10). Defendant PKC Investments is owned by the individual defendants, who are all current residents of South Carolina. (Id. ¶¶ 3, 5, 10-13). Specifically, defendant Moran is in charge of "advertising and marketing" for the restaurant. (Phillip Bates Dep. (DE 38-2) at 114:16-18).

B.    Individual Defendants' Personal Connections with North Carolina

Defendants have a number of personal connections to North Carolina. Defendant Phillip Bates is a former North Carolinian, having lived in Southport specifically until departing the state in 1989 or 1990. (Phillip Bates Dep. (DE 38-2) at 12:20-13:4; Phillip Bates Aff. (DE 22-2) ¶ 5). Defendant Kathy Bates, too, is a former resident of Southport, North Carolina, having moved away in 1990. (Kathy Bates Dep. (DE 38-4) at 5:18-6:18).

The two (collectively, the "Bates Defendants") have also made a number of trips back to North Carolina after moving away. Kathy Bates's sister and parents live, or lived, in Southport, and the Bates Defendants used to periodically visit those relatives for holidays such as Christmas and Thanksgiving. (Phillip Bates Dep. (DE 38-2) at 26:12-27:6, 28:3-4; see also id. at 19:20-24 (recounting a singular visit to defendant Kathy Bates's sister "a few years ago")). The Bates Defendants also visited Southport for defendant Kathy Bates's father's funeral, after his death "a

5

couple [of] years ago." (Id. at 24:5-14; see also Kathy Bates Dep. (DE 38-4) at 11:21-24 (estimating that she had been back to Southport 35 times since moving away in 1990)).

Defendant Moran, while never residing in North Carolina, has traveled to the state for overnight visits with her daughter in Charlotte "approximately 75 times . . . in the past ten years." (Moran Dep. (DE 38-3) at 9:15-23, 10:16-11:13). She also attended the funeral of defendant Kathy Bates's father in Southport, as well as visiting Wilmington, North Carolina, for "shopping . . . about 13 years ago." (See id. at 10:3-15).

Beyond their other visits to Southport, the Bates Defendants have been to the Provision Company restaurant itself. Defendant Phillip Bates ate at the restaurant approximately "four to five times . . . between 1995 and 2000," as part of "flounder fishing" trips. (Phillip Bates Dep. (DE 38-2) at 18:22-19:19). Defendant Kathy Bates "probably" joined him for those meals and may have possibly eaten there other times. (Id. at 28:18-29:10; see Kathy Bates Dep. (DE 38-4) at 13:18-25). Finally, defendant Phillip Bates visited a second Provision Company restaurant location, not at issue in the complaint, in Holden Beach, North Carolina, in his role as a "beverage manager" for PYA/Monarch Foods, although he had moved to South Carolina by that time. (Phillip Bates Dep. (DE 38-2) at 13:10-15:7, 63:8-65:8).

C.      Defendants' Business and North Carolina

Inlet Provision Company, itself, has ties to North Carolina. North Carolinians patronize the restaurant, (Phillip Bates Dep. (DE 38-2) at 70:8-15), as part of the influx of tourists during the summer. (Moran Dep. (DE 38-3) at 36:21-22). The restaurant itself is approximately 40 miles from the North Carolina border. (Phillip Bates Aff. (DE 22-2) ¶ 19; see Phillip Bates Dep. (DE 38-2) at 29:12-15).

6

Moreover, Inlet Provision Company has been advertised in ways available to North Carolinians, online and in print. The restaurant has an online website. (Website Screenshot (DE 22-1) at 1). It has been advertised by the <u>Grand Strand Magazine</u>, <u>Sasee</u> magazine, an entity called Town Planner, and a radio station called Wave 104.1 FM. (Moran Dep. (DE 38-3) at 39:12-25, 39:18-41:11, 43:12-17; Phillip Bates Dep. (DE 38-2) at 103:9-21). Inlet Provision Company is also able to be reviewed on Yelp and Tripadvisor's respective websites. (<u>See, e.g.</u>, Customer Reviews (DE 38-13) at 2, 18).

The Inlet Provision Company's website, as it appeared prior to and at the initiation of this litigation, appears, in part, as follows:



(Website Screenshot (DE 22-1) at 1); <u>see also</u> Inlet Provision Co. Home Page, https://www.inletprovisioncompany.com/ [https://perma.cc/KZ24-VKL6].[5] As can be seen above, the restaurant's website has a "Mailing List," which allows for visitors to the website to "sign up"

---

[5]     Subsequent to the instant briefing and hearing on this motion, defendants updated and altered Inlet Provision Company's website, (<u>compare</u> Inlet Provision Co. Home Page, https://perma.cc/KZ24-VKL6 (captured May 11, 2022), <u>with</u> Inlet Provision Co. Home Page, https://www.inletprovisioncompany.com/ (last visited July 7, 2022)), as they had planned previously to do. (Phillip Bates Dep. (DE 38-2) at 112:4-25). The court's analysis herein is based on the website in the form upon which the parties based their briefing and upon which the court heard argument on May 19, 2022.

7

to be on "the list" that could have been used to send out "a newsletter or some sort of [other] mailing" to those on list. (Phillip Bates Dep. (DE 38-2) at 52:6-53:10). At the time of the instant motion, over 1,000 individuals had signed up for the mailing list, providing their email addresses, full names, and the month and day of their birth dates. (Mailing List (DE 39-3) at 1-33).

However, the individual defendants contend that, although "[f]or years [they] knew" of that capacity of the website, they "ha[d] never been able to access it," until after the initiation of the instant litigation. (Phillip Bates Dep. (DE 38-2) at 48:14-15, 54:13-15). Defendants, "three or four years ago," had asked "Ordereze," the company tasked with maintenance of the website and providing certain online marketing services, "to set [defendants] up so [they] could gather the[] e-mails," but that "never happened." (Id. at 52:14-53:20; Moran Dep. (DE 38-3) at 64:5-21; see also id. at 62:24-65:23 (explaining that an Inlet Provision Company waiter named Alex primarily manages or managed online marketing for the restaurant)). Defendant Phillip Bates represents that he does not know why Ordereze did not assist defendants in accessing the emails but contends that "it[] [is] kind of crazy that [defendants have] done nothing with [the email list]." (Phillip Bates Dep. (DE 38-2) at 53:10-20).

Grand Strand Magazine is based out of Myrtle Beach, South Carolina, (Grand Strand Magazine Media Kit (DE 38-7) at 2), which encompasses a geographical area "sometimes referred to as the Grand Strand," inclusive of Murrells Inlet. (Phillip Bates Dep. (DE 38-2) at 68:19-69:8, 70:3-7). The magazine promotes itself as "an integral part of South Carolina's coast" and contends that it is "the authority on living well in one of the fastest growing communities in the Southeast." (Grand Strand Magazine Media Kit (DE 38-7) at 2). Grand Strand Magazine claims to have a total annual readership of 480,000 and an average readership of 80,000 per issue, with subscribers in 36 states including North Carolina. (Id. at 4). It is also distributed at newsstands within a 200-

mile radius of Myrtle Beach, South Carolina, including towns in North Carolina such as Southport. (Id.; Grand Strand Locations (DE 38-8) at 4). Defendants advertised Inlet Provision Company in Grand Strand Magazine approximately four to five times between 2019 and 2020. (Moran Dep. (DE 38-3) at 44:22-45:4; Grand Strand Email Correspondence (DE 39-1) at 18).

Another publication in which defendants advertised Inlet Provision Company is Sasee magazine, which is based out of Murrells Inlet, South Carolina. (Id. at 39:17-40:12; Sasee Magazine Media Kit (DE 38-9) at 5). Sasee is a "premier lifestyle magazine" for "[s]asee [sic] women everywhere." (Sasee Magazine Media Kit (DE 38-9) at 3). It purports to have an estimated monthly print readership of 50,000. (Id. at 6). The publication is distributed throughout South Carolina as well as portions of North Carolina such as Ocean Isle and other parts of Brunswick County, (id. at 6, 10), which includes Southport, (Phillip Bates Dep. (DE 38-2) at 125:21-126:1). Defendants advertised in Sasee magazine approximately seven times in 2019, six to seven times in 2020, and two or three times in 2021. (See Moran Dep. (DE 38-3) at 109:23-25, 114:2-9, 116:2-9. But see also id. at 39:21-40:12 (estimating, at January 25, 2022, deposition, that defendants had advertised in Sasee six to eight times "in the last two years")).[6]

Another avenue through which defendants advertised their restaurant is the "Town Planner Calendar." (Moran Dep. (DE 38-3) at 40:23-41:1). It is a "monthly calendar that is mailed to residents . . . in Murrells Inlet[ and] South Strand, and it has coupons in it." (Id. at 40:20-22). The calendar is sent out yearly, and defendants advertised in the calendar in 2019 and 2020. (Id. at 40:25). Inlet Provision Company is also promoted on Town Planner's website. (Id. at 144:18-21). Coupons for the restaurant can be downloaded from there and from the Town Planner mobile application. (See id. at 145:11-146:12; Town Planner Screenshots (DE 38-15) at 2).

---

[6] It is not clear from the record where plaintiff's counsel derived his estimate in a deposition question of "approximately two dozen ads." (Moran Dep. (DE 38-3) at 117:19-118:2).

9

Finally, defendants advertise Inlet Provision Company on the radio, through a radio station called Wave 104.1 FM. (Phillip Bates Dep. (DE 38-2) at 103:9-21). Defendants purchased 15-to-30-second radio spots to promote their restaurant, advertising approximately 51 times in 2020 and possibly an indeterminate number of times in 2021. (Id. at 104:18-105:3). A third-party website describes Wave 104.1's reach as stretching slightly into North Carolina, (Wave 104.1 Coverage Map (DE 38-17) at 2; see also Phillip Bates Dep. (DE 38-2) at 109:23-110:17), although the same site states that Wave 104.1 is licensed to Myrtle Beach, South Carolina, and "is part of that radio market." (Wave 104.1 Coverage Map (DE 38-17) at 2).

## COURT'S DISCUSSION

A.    Motion to Dismiss for Lack of Personal Jurisdiction

1.    Standard of Review

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of a claim for lack of personal jurisdiction. "Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." Grayson v. Anderson, 816 F.3d 262, 267 (4th Cir. 2016).[7] If the court "addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive," id. at 268, with the court "draw[ing] all reasonable inferences arising from the proof, and resolv[ing] all factual disputes, in the plaintiff's favor." Mylan Lab'ys, Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). However, "[o]nce the court has provided" "the parties a fair opportunity to present both the relevant jurisdictional evidence and their legal arguments," "it must hold the

---

[7]    Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

plaintiff to its burden of proving facts, by a preponderance of the evidence, that demonstrate the court's personal jurisdiction over the defendant." Grayson, 816 F.3d at 268; Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003) ("When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence.").

  2.  Analysis

  "A lawful assertion of personal jurisdiction over a defendant requires satisfying the standards of the forum state's long-arm statute and respecting the safeguards enshrined in the Fourteenth Amendment's Due Process Clause." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012); Carefirst, 334 F.3d at 396 ("Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law."). North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4(1)(d), "permits the exercise of personal jurisdiction over a defendant to the outer limits allowable under federal due process." Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558-59 (4th Cir. 2014) (citing Dillon v. Numismatic Funding Corp., 291 N.C. 674 (1977)). Thus, the court's "statutory inquiry merges with [its] constitutional inquiry." Carefirst, 334 F.3d at 396; Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001) (explaining that because "North Carolina's long-arm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause, . . . the dual jurisdictional requirements collapse into a single inquiry").

  "A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to

defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" Carefirst, 334 F.3d at 397 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). This standard can be satisfied "through two different approaches—by finding specific jurisdiction . . . or by finding general jurisdiction." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711 (4th Cir. 2002); Universal Leather, 773 F.3d at 559 ("[T]here are two paths permitting a court to assert personal jurisdiction over a nonresident defendant.").

General jurisdiction requires "demonstrating the defendant's continuous and systematic contact with the [forum s]tate," Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 198 (4th Cir. 2018), and "extends to any and all claims brought against a defendant." Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021). On the other hand, specific jurisdiction requires "demonstrating that the defendant purposely established minimum contacts in the forum state such that it should reasonably anticipate being haled into court there on a claim arising out of those contacts," Sneha Media, 911 F.3d at 198, and reaches only the specific "claims [that] . . . arise out of or relate to the defendant's contacts with the forum." Id.

Plaintiff asserts that the court has both general and specific jurisdiction over defendants.

a.      General Jurisdiction

Plaintiff claims that "[a]ll three of the individual defendants have vast contacts in North Carolina that would almost certainly subject them and their company to general jurisdiction in [North Carolina]." (Pl.'s Resp. (DE 38) at 10). The court cannot agree.

i.      Defendant PKC Investments

"A court may assert general jurisdiction over foreign . . . corporations to hear any and all claims against them when their affiliations with the [s]tate are so continuous and systematic as to render them essentially at home in the forum [s]tate." Goodyear Dunlop Tires Operations, S.A. v.

12

Brown, 564 U.S. 915, 919 (2011). A corporation is essentially at home in its "place of incorporation and principal place of business." Daimler AG v. Bauman, 571 U.S. 117, 137 (2014); see also Ford, 141 S. Ct. at 1024 (explaining that the Supreme Court has left open "'the possibility that in an exceptional case' a corporation might also be 'at home' elsewhere" (quoting Daimler, 571 U.S. at 139 n.19)). However, "a corporation's 'continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" Daimler, 571 U.S. at 132 (quoting International Shoe, 326 U.S. at 318); Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1199 (4th Cir. 1993). For example, the Supreme Court has held that a defendant was not "so heavily engaged in activity in Montana as to render it essentially at home in that [s]tate" even where it "ha[d] over 2,000 miles of railroad track and more than 2,000 employees in Montana." BNSF Ry. Co. v. Tyrrell, 137 S. Ct. 1549, 1559 (2017).

Here, defendant PKC Investments was organized in South Carolina and has its principal place of business in that state. On the record before the court, the individual defendants' visits into North Carolina were not in their roles as members of defendant PKC Investments. And defendants' "advertising and solicitation activities," discussed in further depth below, "alone do not constitute the 'minimum contacts' required for general jurisdiction." Nichols, 991 F.3d at 1200.

In sum, plaintiff does not direct the court's attention to any case in which general jurisdiction has been found on comparable contacts with the forum state. The court is guided by the Tyrrell Court's exemplary analysis and concludes that the evidenced contacts of defendant PKC Investments with North Carolina fail to constitute the continuous and systematic contacts necessary to render it essentially at home in North Carolina.

13

ii.       Individual Defendants

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" Goodyear, 564 U.S. at 924. As federal courts have explained, "the threshold level of minimum contacts to confer general jurisdiction is significantly higher than for specific jurisdiction." ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 623 (4th Cir. 1997).

The Bates Defendants' former residence in North Carolina, on its face, does not constitute their domicile there, given their current, long-term residence in South Carolina. Further, the court's research reveals no cases where contacts like the individual defendants' intermittent trips to North Carolina have been held to constitute a cognizable basis for general jurisdiction. Plaintiff has not demonstrated that the individual defendants have the requisite systematic and continuous contacts with North Carolina.

Accordingly, the court does not have general jurisdiction over defendants. The court next considers whether it has specific jurisdiction over defendants in regard to plaintiff's claims.

b.      Specific Jurisdiction

"To determine whether specific jurisdiction lies in the forum state," the court "consider[s] (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the [s]tate; (2) whether the plaintiffs' claims arise out of those activities directed at the [s]tate; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 189 (4th Cir. 2016).

The touchstone of the purposeful availment inquiry is whether "the defendant's conduct and connection with the forum [s]tate are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The defendant's contacts must be by its own choice and not "random, isolated, or fortuitous." Keeton

v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984); ESAB Grp., 126 F.3d at 625 ("[D]efendant's actions must be directed at the forum state in more than a random, fortuitous, or attenuated way."). The contacts "must show that the defendant deliberately reached out beyond its home." Ford, 141 S. Ct. at 1025; Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76 (1985) ("[W]here the defendant deliberately has engaged in significant activities within a [s]tate . . . , he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.").

Accordingly, "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum [s]tate to justify an assertion of jurisdiction." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 417 (1984); In re Celotex Corp., 124 F.3d 619, 629 (4th Cir. 1997) (affirming rejection of "a rule [that] would subject defendants to judgment in locations based on the activity of third persons and not the deliberate conduct of the defendant, making it impossible for defendants to plan and structure their business contacts and risks"). Additionally, the defendant's contacts must be "with the forum [s]tate itself," not merely "contacts with persons who reside there." Walden v. Fiore, 571 U.S. 277, 284-85 (2014) (explaining that the connection between the defendant and the forum "must arise out of contacts that the defendant himself creates with the forum [s]tate").

The Fourth Circuit has enumerated a number of considerations relevant to the purposeful availment inquiry, especially pertinent here are: "whether the defendant reached into the [s]tate to solicit or initiate business" and "whether the defendant made in-person contact with a resident of the [s]tate regarding the business relationship." Sneha Media, 911 F.3d at 198-99.

Plaintiff points to the following as defendants' relevant contacts to North Carolina or as evidence of such: 1) Inlet Provision Company's North Carolinian customers; 2) Inlet Provision Company's North Carolina-accessible website; 3) defendants' advertising in North Carolina; and 4) defendants' in-person visits to North Carolina. The court turns to analysis of each of plaintiff's proffered contacts.

i.        North Carolinian Customers

Although it is undisputed that North Carolinians constitute a portion of Inlet Provision Company's customers, (Moran Dep. (DE 38-3) at 70:8-12; see also Customer Reviews (DE 38-13)), such evidence standing on its own fails to demonstrate defendants' purposeful availment of the privilege of operating in North Carolina because the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." Walden, 571 U.S. at 285. For example, the United States Court of Appeals for the Fourth Circuit has rejected evidence of "sales . . . initiated by . . . customer[s]" from the forum state as constituting cognizable evidence of a defendant's requisite minimum contacts with a forum state. Fed. Ins. Co. v. Lake Shore Inc., 886 F.2d 654, 658 (4th Cir. 1989); accord O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 318 (3d Cir. 2007) ("A Philadelphia vendor may sell a lot of cheesesteaks to German tourists, but that does not mean he has purposefully availed himself of the privilege of conducting activities within Germany."); AMA Multimedia, LLC v. Wanat, 970 F.3d 1201, 1211 (9th Cir. 2020) (explaining that the fact that "nearly 20% of [defendant's website's] traffic comes from U.S. users . . . does not establish that [defendant] expressly aimed at the U.S. market").

Inlet Provision Company's furnishing of services to North Carolinians is relevant, potentially, as evidence of purposeful availment, although not constituting purposeful availment,

16

in and of itself, if that furnishing is "the result of sales efforts by [defendant] in [the forum state],"
<u>Federal Ins.</u>, 886 F.2d at 658 — that is, stemming from "defendant reach[ing] into the [s]tate to
solicit or initiate business," <u>Sneha Media</u>, 911 F.3d at 198-99. Thus, the court turns to determining
the presence of this factor, pertinent here in the form of defendants' online and advertising
activities.

ii.      Inlet Provision Company Website

The Fourth Circuit has explained that "[a] [s]tate may, consistent with due process, exercise
judicial power over a person outside of the [s]tate when that person (1) directs electronic activity
into the [s]tate, (2) with the manifested intent of engaging in business or other interactions within
the [s]tate, and (3) that activity creates, in a person within the [s]tate, a potential cause of action
cognizable in the [s]tate's courts." <u>Carefirst</u>, 334 F.3d at 399; <u>Fidrych v. Marriott Int'l, Inc.</u>, 952
F.3d 124, 142 (4th Cir. 2020). However, "a person's action of placing information on the
[i]nternet is not sufficient by itself to subject that person to personal jurisdiction in each [s]tate in
which the information is accessed." <u>Carefirst</u>, 334 F.3d at 399. Thus, an out-of-state defendant
must have done something more than merely place information on the internet. <u>ALS Scan, Inc. v.
Digital Service Consultants, Inc.</u>, 293 F.3d 707, 714 (4th Cir. 2002); <u>Young v. New Haven Advoc.</u>,
315 F.3d 256, 263 (4th Cir. 2002). "Rather, [it] must have acted with the manifest intent of
targeting" residents of the forum state. <u>Carefirst</u>, 334 F.3d at 400.

In making this determination, one such "jurisdictionally relevant fact" is "[t]he interactivity
of a website." <u>Fidrych</u>, 952 F.3d at 141; <u>see also</u> <u>ALS Scan</u>, 293 F.3d at 713 (adopting the
interactivity model of <u>Zippo Manufacturing Co. v. Zippo Dot Com, Inc.</u>, 952 F. Supp. 1119 (W.D.
Pa. 1997)). Yet, the court should not "attach too much significance on the mere fact of
interactivity" and "risk losing sight of the key issue in a specific jurisdiction case — whether 'the
defendant has <u>purposefully directed</u> [its] activities at residents of the forum.'" <u>Fidrych</u>, 952 F.3d

17

at 141 (quoting Burger King, 471 U.S. at 472); UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 353 (4th Cir. 2020) ("[T]he internet we know today is very different from the internet of 1997, when Zippo was decided.").

Turning first to the "interactivity" of the Inlet Provision Company website, the court concludes that it falls into the Zippo model's "middle ground" of interactivity. Fidrych, 952 F.3d at 142 ("A passive [w]eb site . . . does little more than make information available to those who are interested in it . . . . The middle ground is occupied by interactive [w]eb sites where a user can exchange information with the host computer."). As demonstrated in the record, the functionality of the website extends to viewing certain information about Inlet Provision Company and submitting information in order to be added to Inlet Provision Company's mailing list, the latter of which constitutes interactivity under Zippo's model. Id. However, in doing so, defendants do not "clearly do[] business over the internet," and do "not us[e] [their] website to enter into long-term contracts that involve the knowing and repeated transmission of computer files over the [i]nternet." Id. at 141-42.

Accordingly, "[t]he interactivity of the website is relatively limited" given that it "is not used to create a continuing, back-and-forth relationship between [defendants] and the website user." Id. at 142. Thus, "the level of interactivity of [the] website . . . is not enough, on its own, to make the website a sufficient basis to support the exercise of specific jurisdiction," meaning that "additional analysis is required to answer the jurisdictional question." Id.

Under that additional analysis, in this case there is not sufficient "indicat[ion] that [defendants] purposefully (albeit electronically) directed [their] activity in a substantial way to the forum state," by "manifest[ing] an intent to target and focus on [North Carolina] readers" "through the [i]nternet postings." Young, 315 F.3d at 263. "The overall content of . . . [the] website[] is

18

decidedly local." Id.; see, e.g., Carefirst, 334 F.3d at 401 ("[T]he overall content of [defendant's] website has a strongly local character, emphasizing that [defendant's] mission is to assist Chicago-area women in pregnancy crises."). It reveals the restaurant's South Carolina address, describing itself as fresh and "local," and the map provided at the bottom of the website is tightly focused on the Murrells Inlet area. (Website Screenshot (DE 22-1) at 1); Inlet Provision Co. Home Page, https://www.inletprovisioncompany.com/ [https://perma.cc/KZ24-VKL6]. The "website contains [no] advertisements aimed at a [North Carolina] audience." Young, 315 F.3d at 263.

The website's primary interactive feature, the mailing list, also lacks indicia of a manifest intent to target and focus on North Carolina or North Carolinians. Although it appears over 1,000 individuals have signed up for the mailing list, the state in which they reside is not disclosed. (See Mailing List (DE 39-3) at 1-33). Further, the ability to sign up for the mailing list "[i]s accessible to all but targeted at no one in particular." Fidrych, 952 F.3d at 143 ("[E]ven though [defendant's] website is interactive, [it] does not use it to target [the forum state's] residents in particular."). Finally, through inexplicable obstinance on either the side of Ordereze or defendants, defendants were unable to access the entries in the mailing list until initiation of this litigation, meaning they were unable to use such to target intentionally or focus on North Carolinians through electronic communications.

In sum, defendants' website fails to provide a sufficient jurisdictional hook.[8] The court thus turns to defendants' advertising efforts.

---

[8] The court concludes similarly that any online availability of Town Planner coupons for Inlet Provision Company or of the two magazines fails to indicate the requisite "intent to target and focus on [North Carolina] readers." Young, 315 F.3d at 263.

iii.    Advertising

It is undisputed that defendants' advertising efforts reached North Carolina. <u>Grand Strand Magazine</u> was distributed at four grocery stores in southeastern North Carolina during the time in which Inlet Provision Company was advertised in the magazine four to five times. (Grand Strand Locations (DE 38-8) at 4; Moran Dep. (DE 38-3) at 44:22-45:4). Similarly, <u>Sasee</u> was distributed in portions of Brunswick County like Ocean Isle, North Carolina, during the time in which defendants advertised Inlet Provision Company 15 to 17 times. (Sasee Magazine Media Kit (DE 38-9) at 6, 10; <u>see</u> Moran Dep. (DE 38-3) at 109:23-25, 114:2-9, 116:2-9). Finally, crediting radiolineup.com's depiction of Wave 104.1 FM's signal strength, (Wave 104.1 Coverage Map (DE 38-17) at 2), Inlet Provision Company's 51 radio-spot advertisements reached North Carolina. (Phillip Bates Dep. (DE 38-2) at 104:18-105:3).

The crux of the parties' disagreement is whether the individual defendants' knowledge or ignorance of the reach of the advertising into North Carolina is dispositive. The court, while not crediting defendants' proffered ignorance, concludes that it is not dispositive, but that the minimal amount of solicitation that reached North Carolina does not provide a sufficient basis for the court to find the requisite minimum contacts by defendants.

As an initial matter, although the individual defendants, when asked, testified that they were not aware the two magazines at issue reached North Carolina, (<u>see, e.g.</u>, Phillip Bates Dep. (DE 38-2) at 117:15, 123:6-25; Moran Dep. (DE 38-3) at 103:17-104:23, (DE 37-3) at 162:7-8), the court does not credit such. Defendants received and possessed the media kit of each magazine, (<u>see</u> Email Correspondence (DE 38-12) at 2; Moran Dep. (DE 38-3) at 102:15-20), which each reveal a North Carolina distribution area. (Grand Strand Magazine Media Kit (DE 38-7) at 4;

Sasee Magazine Media Kit (DE 38-9) at 6, 10).[9]  Therefore, defendants "kn[ew] . . . either actually of constructively" about the North Carolina distribution of <u>Grand Strand Magazine</u> and <u>Sasee</u>.  <u>Cf. UMG Recordings</u>, 963 F.3d at 354.  As to defendants' radio advertising, defendant Phillip Bates, who was charged with advertising Inlet Provision Company on the radio, testified he was not surprised that Wave 104.1's radio signal reached North Carolina.  (Phillip Bates Dep. (DE 38-2) at 106:9, 110:11-19).

Additionally, the draw of the Grand Strand region for North Carolinians across the border gives rise to an inference that a publication that is distributed in the Grand Strand may also be distributed in North Carolina.  (<u>See</u> Phillip Bates Dep. (DE 38-2) at 69:22-70:15 (explaining that he would "have to assume" that some percentage of tourists that come to Inlet Provision Company are from North Carolina although he "would[ not] venture to say" an exact percentage);[10] Moran Dep. (DE 38-3) at 34:14-35:20 (explaining that although she did not know what percentage of tourists visiting the Grand Strand area were from North Carolina, she was "sure there[] [are] several from North Carolina")).  That inference further prevents the court from crediting defendants' claim to be unaware that <u>Grand Strand Magazine</u> and <u>Sasee</u> were distributed in North Carolina.  (Moran Dep. (DE 37-3) at 98:4-15; Phillip Bates Dep. (DE 38-2) at 123:6-8).

However, such knowledge is not dispositive of the personal jurisdiction inquiry, in this instance.  For defendants to fall permissibly under the court's jurisdiction, due process requires that defendants must have created a "'<u>substantial</u> connection' between [them] and the forum state." <u>Asahi Metal Indus. Co. v. Superior Ct. of Cal.</u>, 480 U.S. 102, 112 (1987) (plurality) (emphasis

---

[9]       The court, for similar reasons, also does not credit defendant Phillip Bates's testimony that he did not know that Inlet Provision Company was advertised in the <u>Grand Strand Magazine</u> prior to the initiation of litigation.  (Phillip Bates Dep. (DE 38-2) at 113:5-13).  Moreover, it is undisputed that he knew prior to this litigation that Inlet Provision Company was advertised in <u>Sasee</u> magazine.  (<u>Id.</u> at 120:16-121:22).

[10]      Although defense counsel objected to this line of questioning, (Phillip Bates Dep. (DE 38-2) at 69:25, 70:11), he did not identify a basis for that objection.

added) (quoting Burger King, 471 U.S., at 475). Defendants' contacts must be more than "isolated," Keeton, 465 U.S. at 774, and "sporadic," Ford, 141 S. Ct. at 1028 n.4. They must "represent significant activities within the state." Fed. Ins., 886 F.2d at 658; Young, 315 F.3d at 263 (requiring that defendants "directed [their] activity in a substantial way to the forum state" (emphasis added)). Accordingly, courts have concluded that "minimal solicitation does not generally support jurisdiction." Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C., 148 F.3d 1080, 1089-90 (D.C. Cir. 1998); see Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 280 (4th Cir. 2009) ("Although [plaintiff] argues that [defendant] reached out to it in Virginia, this assertion, even when coupled with the cited communications, is not enough . . . . On these facts, [defendant's] contact with Virginia was simply too attenuated to justify the exercise of personal jurisdiction."); see, e.g., Pan-Am. Prod. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 680 (M.D.N.C. 2011) (holding it did not have specific personal jurisdiction over defendant where "there [was] no evidence that [the relevant d]efendants . . . solicit or initiate business in North Carolina" "[a]part from the regional newspaper advertisements").

For example, in contrast, the Supreme Court has concluded that a defendant's "regular circulation of magazines in [a] forum [s]tate is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine," where that circulation demonstrated "continuous[] and deliberate[] exploit[ation]" of the forum state's market in the form of "some 10 to 15,000 copies of [the] magazine" to customers in the forum state each month. Keeton, 465 U.S. at 772, 773-74, 781.

Here, the distribution of print advertisements in the two magazines fails to constitute such significant activities. Defendants advertised four to five times in Grand Strand Magazine over two years, reaching four grocery stores in North Carolina each time. Those four grocery stores, on the

record, represent approximately 2.5% of the total number of newsstands at which <u>Grand Strand</u> <u>Magazine</u> is distributed. (Grand Strand Magazine Media Kit (DE 38-7) at 4; <u>see also</u> Grand Strand Locations (DE 38-8) at 2-18 (enumerating approximately 40 specific locations to buy the magazine, of which the four North Carolina locations would represent ten percent)). The magazine's per issue readership estimate of 80,000 is based on the assumption that the 15,000-issue print run will be "pass[ed] along" approximately five times to a new reader. (Grand Strand Magazine Media Kit. (DE 38-7) at 4). This means that somewhere in the realm of 1,500 to 7,500 issues that contained defendants' advertisement were distributed total in North Carolina over the course of two years.[11] This pales in comparison to the "some 10 to 15,000 copies of [the] magazine" sent to customers in the forum state <u>each month</u> in <u>Keeton</u> that the Court concluded represented "continuous[] and deliberate[] exploit[ation]" of the forum state's market. 465 U.S. at 772, 773-74, 781.

There is no evidence in the record from which the court can infer what percentage North Carolina represents of <u>Sasee</u> magazine's distribution, even after plaintiff has had the opportunity to elicit such during limited jurisdictional discovery. Even assuming North Carolina constituted one-sixth of <u>Sasee</u>'s distribution, given its media kit's description of distribution in two full South Carolina counties and only a portion of Brunswick County, (Sasee Media Kit (DE 38-9) at 6), approximately 8,400 North Carolinians read the <u>Sasee</u> magazine each month that it was distributed for an approximate total of 143,000 over the course of 36 months during defendants' ad run in the magazine. <u>Sasee</u> magazine's media kit does not disclose whether its monthly print readership estimate is premised on "pass-along readership" calculations similar to <u>Grand Strand Magazine</u>'s. (<u>Compare</u> Sasee Media Kit (DE 38-9) at 6, <u>with</u> Grand Strand Magazine Media Kit (DE 38-7) at

---

[11] The court's approximation is based on estimating that between 2.5 and 10% of the 15,000-issue printing were distributed four to five times to the four locations in North Carolina.

4).  However, even comparing the possible number of North Carolinian <u>readers</u> to the number of <u>issues</u> actually distributed in <u>Keeton</u>, it does not rise to the level of continuous and deliberate exploitation examined by the Supreme Court in that case.

Finally, defendants' radio advertisements, to the extent they entered North Carolina as represented by radiolineup.com, do not represent the kind of targeted radio campaign that courts have found constitutes the requisite minimum contacts with a state.  <u>See, e.g.</u>, <u>Rio Props., Inc. v. Rio Int'l Interlink</u>, 284 F.3d 1007, 1020 (9th Cir. 2002) (describing direction of "an insistent marketing campaign . . . toward [the forum]," including radio advertisements specifically targeting the forum and a city within).  The eight-to-12-mile (based on the scale of plaintiff's proffered map, (Coastal Map (DE 38-18) at 2)) ingress of Wave 104.1's radio signals into North Carolina carrying 51 of defendants' 15-to-30-second radio advertisements over the course of a year fails in this instance to constitute the required significant activities in the state.

Plaintiff's principally cited case in opposition to this conclusion, <u>Lane v. WSM, Inc.</u>, 575 F. Supp. 1246 (W.D.N.C. 1983), relies on the premise that "[f]ewer 'minimum contacts' are required of a non-resident defendant in an action involving one of the forum state's citizens than would be required in a case involving a plaintiff with few connections to the forum state."  <u>Id.</u> at 1249.  That premise, however, subsequently has been rejected.  <u>See</u> <u>Walden</u>, 571 U.S. at 284 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff . . . and the forum State."); <u>Bristol-Myers Squibb Co. v. Superior Ct. of Cal.</u>, 137 S. Ct. 1773, 1782 (2017) (confirming that "the mere fact that [the complained of] conduct affected plaintiffs with connections to the forum State d[oes] not suffice to authorize jurisdiction").  Accordingly, <u>Lane</u> is inapposite.

Plaintiff also points to Calder v. Jones, 465 U.S. 783 (1984), and its progeny as demanding that the court find it has personal jurisdiction over defendants. The court does not agree.

A court can "exercise specific personal jurisdiction over a nonresident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that that conduct would cause harm to a forum resident." Carefirst, 334 F.3d at 397-98 (citing Calder v. Jones, 465 U.S. 783). Under this "effects test,"

> the plaintiff [must] establish that 1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

Id. at 398 n.7; Consulting Eng'rs, 561 F.3d at 280. While this inquiry touches on "the defendant['s] activities 'focus[ed]' on the plaintiff," the jurisdictional inquiry does abandon its "focus[] on 'the relationship among the defendant, the forum, and the litigation.'" Walden, 571 U.S. at 287 (quoting Calder, 465 U.S. at 788); Consulting Eng'rs, 561 F.3d at 280 ("The effects test does not supplant the minimum contacts analysis, but rather informs it.")

"There are . . . important limitations on th[e] principle" delineated by Calder. Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 230 (4th Cir. 2019). The in-forum effects from out-of-forum conduct "must create a connection to the forum, not just to parties who happen to live there" and one that is "substantial." Id. "[A] person cannot be haled into the forum simply because he knew that his conduct would have incidental effects there; he must have []expressly aimed[] his conduct at the forum." Id. Only where "the forum can be said to be the focal point of the tortious activity" has "defendant expressly aimed his tortious conduct at the forum." Consulting Eng'rs, 561 F.3d at 280; Young, 315 F.3d. at 262. In the context of publications, this is met where the publication is "designed to attract or serve [the forum state's] audience" and distributed "with the manifest intent of targeting [forum state] readers." Carefirst, 334 F.3d at 400; ESAB Grp., 126

25

F.3d at 625 (explaining that defendant's activities did not "manifest behavior intentionally targeted at and focused on [the forum state]" (citing Calder, 465 U.S. at 789-90)).

For example, in Calder, the Supreme Court explained that personal jurisdiction was proper where defendants' "actions were expressly aimed at California," "[a]nd they knew that the brunt of [the potentially devastating] injury would be felt by [plaintiff] in the [s]tate in which she lives and works and in which the [publication] has its largest circulation," 600,000 copies weekly, "almost twice the level of the next highest [s]tate." 465 U.S. at 786 & n.2, 789-90.

Here, even if the court were to assume for the sake of this inquiry that defendants committed an intentional tort through their advertising that plaintiff felt the brunt of the harm from in North Carolina, the record does not reflect by preponderance of the evidence that defendants expressly aimed their tortious conduct at North Carolina such that North Carolina can be said to be the focal point of the tortious activity. As highlighted above, North Carolina constitutes only a modest portion of the magazines' circulation, and certainly is not the state in which those publications had their largest circulation at nearly twice the level of the next highest state. Similarly, Plaintiff's proffered map of Wave 104.1's signal shows the vast majority of the radio station's coverage in South Carolina. In aggregate, the proportion of allegedly tortious advertising reaching North Carolina is indicative that North Carolina was not the focal point of defendants' alleged tortious activity.

The character of each advertising medium also indicates that tortious activity within that medium would not have its focal point in North Carolina. See Young, 315 F.3d at 263 ("The overall content of both websites is decidedly local [to a non-forum state], and neither newspaper's website contains advertisements aimed at a [forum state] audience."). The name of Grand Strand Magazine itself reveals its South Carolina focus, and the publication's self-acclamatory description

as a Myrtle Beach-based magazine that "is an integral part of South Carolina's coast" confirms this focus. (See Grand Strand Magazine Media Kit (DE 38-7) at 2). Nothing in Sasee's materials reveals a North Carolina focus or specialization such that the court could conclude that plaintiff has met its burden of showing defendants' alleged tortious activity in that publication had its focal point in North Carolina. (See Sasee Media Kit (DE 38-9) at 1-21). Wave 104.1, on plaintiff's evidence, "is a part of th[e] [Myrtle Beach, South Carolina] radio market," and is not otherwise indicated to have a focus on North Carolina. (Wave 104.1 Coverage Map (DE 38-17) at 2).

Thus, the publications and radio station are unlike that vehicle for tortious activity considered in Calder. There, the Supreme Court consider an "allegedly libelous story concern[ing] the California activities of a California resident[,] . . . impugn[ing] the professionalism of an entertainer whose television career was centered in California[, and] . . . draw[ing] from California sources." 465 U.S. at 788-89. Defendants' allegedly trademark infringing advertising does not have the same forum state focus at issue in Calder. Thus, the effects test does not provide a basis for personal jurisdiction here.

Plaintiff further relies on Honda Associates, Inc. v. Nozawa Trading, Inc., 374 F. Supp. 886 (S.D.N.Y. 1974), as analogous. The court does not find the analogy availing. Honda Associates, in analyzing the jurisdictional import of "a total of about 20 catalogs . . . sent to potential customers in the State of New York in response to mail requests, principally generated by advertisements in [a] nationally circulated magazine," specifically construed a New York law that "require[d] no specified level of activity within the State, but only that the plaintiff suffer some damage as a result of a tortious act committed by defendant or its agent in New York." 374 F. Supp. at 888-89. Fourth Circuit law requires a specific level of activity under the effects test: a "substantial" connection to the forum state. Hawkins, 935 F.3d at 230; Consulting Eng'rs, 561

27

F.3d at 280 (The effects test does not supplant the minimum contacts analysis, but rather informs it."); ESAB Grp., 126 F.3d at 626 ("[P]laintiff['s] . . . alleged injury . . . must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld"). Honda Associates's application of a distinct standard thus cannot control the court's analysis here, especially where it has concluded that defendants' advertising efforts do not constitute the requisite minimum contacts with North Carolina.

iv.    In-Person Visits

Even assuming that the individual defendants' visits to the state constituted purposeful availment under the first prong, but see Universal Leather, 773 F.3d at 561 ("[I]n-person business meetings are not []automatically sufficient[] to confer jurisdiction."), such visits would fail the second prong of the test for specific jurisdiction: that "plaintiff['s] claims arise out of those activities directed at the [s]tate." Perdue Foods, 814 F.3d at 189.

Plaintiff's claim for relief must "arise out of or relate to" defendants' minimum sufficient "contacts with the forum." Daimler, 571 U.S. at 127; see Walden, 571 U.S. at 284 (explaining that "the defendant's suit-related conduct must create a substantial connection with the forum [s]tate"). "The first half of th[is] standard," arise out of, "asks about causation." Ford, 141 S. Ct. at 1026. The second half of the standard, with its "phrase 'relate to[,]' incorporates real limits, as it must to adequately protect defendants foreign to a forum," id., such that it requires that "defendant's contacts with the state are . . . the basis for the suit," Carefirst, 334 F.3d at 397, and "form[] a central part of [plaintiff's] claims." Tire Eng'g, 682 F.3d at 306 ("Where activity in the forum state is the genesis of the dispute, this prong is easily satisfied."); see Bristol-Myers, 137 S. Ct. at 1781 ("[T]here must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum [s]tate.").

28

Here, it is undisputed that the individual defendants' in-person visits to North Carolina for a funeral, shopping, and visiting family are not related to plaintiff's claims and thus cannot serve as a basis for specific jurisdiction. Defendant Phillip Bates's deposition testimony reveals that his in-person visit to a Provision Company restaurant in his role with a food distributor was, in fact, not to the Provision Company restaurant at issue here, the one in Southport, North Carolina, (Phillip Bates Dep. (DE 38-2) at 13:10-15:7, 63:8-65:8), meaning that visit cannot serve as a basis for specific jurisdiction. Finally, plaintiff relies on speculation and conjecture to tie the Bates Defendants' meals at plaintiff's restaurant decades before their own restaurant was even started or advertised, (see Phillip Bates Dep. (DE 38-2) at 18:22-19:12), to its current legal claims. See, e.g., Brown v. Geha-Werke GmbH, 69 F. Supp. 2d 770, 776 (D.S.C. 1999) ("Plaintiff's burden of establishing personal jurisdiction simply cannot be discharged by suggestions, possibilities, speculation, conjecture, or surmise."); see also Kulko v. Superior Ct. of Cal., 436 U.S. 84, 93 (1978) ("To hold such temporary visits to a [s]tate a basis for the assertion of in personam jurisdiction over unrelated actions arising in the future would make a mockery of the limitations on state jurisdiction imposed by the Fourteenth Amendment."). This does not meet its evidentiary burden at this stage, and the fact plaintiff believes "discovery . . . on the merits" will help it prove that connection in the future, (Pl.'s Resp. (DE 38) at 10-11), fails the meet its burden now.

In sum, plaintiff has not met its burden to demonstrate that defendants have such contacts with North Carolina that general or specific jurisdiction over them is proper.[12] However, the court must consider whether dismissal, as requested in defendants' principal motion, or transfer under

---

[12] Thus, the court does not reach defendants' argument that venue is improper in the Eastern District for North Carolina.

28 U.S.C. 1404 to the United States District Court for the District of South Carolina, as requested in defendants' motion in the alternative, is proper.

      3.      Remedy

Section 1404 of Title 28 of the United States Code allows "a district court [to] transfer any civil action to any other district where it might have been brought" "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a); In re Carefirst of Maryland, Inc., 305 F.3d 253, 255 (4th Cir. 2002) ("Section 1404(a) authorizes inter-district or inter-division transfers for the convenience of parties and witnesses, in the interest of justice[.]").[13] A district court may do so even where the court lacks personal jurisdiction over the defendants. See Nichols, 991 F.2d at 1201 nn.4-5. See generally Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466 (1962) ("The language of § 1406(a) is amply broad enough to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to venue, whether the court in which it was filed had personal jurisdiction over the defendants or not[.]"); 14D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3827 (3d ed. 2010) (explaining that "[t]he correct way to achieve" transfer when "venue is proper in the district of origin" but "personal jurisdiction cannot be obtained over the defendant in that district" "is to apply the Goldlawr principle to transfers under Section 1404(a)").

Here, transfer to the United States District Court for the District of South Carolina would be for the convenience of parties and in the interest of justice, and this action could have been brought originally there. This court's lack of personal jurisdiction can be cured by transfer to the United States District Court for the District of South Carolina because all indications are that

---

[13]      Defendants do not cite 28 U.S.C. § 1406, which has been held to "authorize[] the transfer of a case to any district, which would have had venue if the case were originally brought there, for any reason which constitutes an impediment to a decision on the merits in the transferor district but would not be an impediment in the transferee district." Porter v. Groat, 840 F.2d 255, 258 (4th Cir. 1988).

defendants would be subject to general jurisdiction there, given that the individual defendants are residents of that state and defendant PKC Investments has its principal place of business there, (Phillip Bates Aff. (DE 22) ¶¶ 3, 10, 12-13). See, e.g., O'Neal v. Hicks Brokerage Co., 537 F.2d 1266, 1268 (4th Cir. 1976) (reversing dismissal of case for lack of personal jurisdiction and remanding to afford "an opportunity to move for transfer of the case to a district where it could have been brought"); see also SongByrd, Inc. v. Est. of Grossman, 206 F.3d 172, 179 n.9 (2d Cir. 2000) ("[W]hether or not venue was proper, lack of personal jurisdiction could be cured by transfer to a district in which personal jurisdiction could be exercised, with the transfer authority derived from either section 1406(a) or section 1404(a)."). Further, that venue would be proper as it is "a judicial district in which any defendant resides" and "all defendants are residents of the [s]tate in which the district is located." 28 U.S.C. § 1391.

In sum, the court concludes that the proper remedy for its lack of personal jurisdiction over defendants is to transfer this case to the United States District Court for the District of South Carolina, in light of the convenience of parties and witnesses and in the interest of justice.

## CONCLUSION

Based on the foregoing, defendants' motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure or, in the alternative, transfer pursuant to 28 U.S.C. § 1404(a) (DE 21) is GRANTED IN PART and DENIED IN PART. That part of the motion seeking dismissal for lack of personal jurisdiction and improper venue is DENIED. That part of the motion seeking transfer of venue, under § 1404(a) is GRANTED. Where the court lacks personal jurisdiction over defendants, and where venue is proper in South Carolina, this matter is transferred to the United States District Court for the District of South Carolina, pursuant to 28 U.S.C. § 1404(a).

31

SO ORDERED, this the 8th day of July, 2022.

LOUISE W. FLANAGAN
United States District Judge